CHARLES F. ALEXANDER AND YVETTE M. ALEXANDER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Alexander v. Commissioner
Docket Nos. 15015-86; 18367-86; 18488-86; 20205-86; 20291-86; 20341-86; 20342-86; 20387-86; 20388-86; 20389-86; 20403-86; 20404-86; 20405-86; 20450-86; 20457-86; 20476-86; 20478-86; 20497-86; 20498-86; 20852-86; 20875-86; 20915-86; 20944-86; 20945-86; 20946-86; 20947-86; 21018-86; 21084-86; 21085-86; 21097-86; 21099-86; 21100-86; 21101-86; 21102-86; 21382-86; 21434-86; 21473-86; 21483-86
United States Tax Court
T.C. Memo 1990-141; 1990 Tax Ct. Memo LEXIS 165; 59 T.C.M. (CCH) 121; T.C.M. (RIA) 90141; March 19, 1990
Bernard P. Kenneally, for all petitioners, except Florence Lewis in docket No. 18488-86 and the petitioner in docket No. 18367-86. Dennis R. DiRicco, [2] for the petitioners in docket Nos. 15015-86 and 21085-86. *169 Robert R. Rubin, Dawn H. Cole, and Kimberly Mitchell-Bott, for the petitioner in docket No. 18367-86. Aaron M. Greenberg, for petitioner Florence Lewis in docket No. 18488-86. Robert W. Towler, for the respondent. PARR
*262 MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined that petitioners in these consolidated cases were liable for income tax deficiencies, additions to tax, and additional interest, as set forth in the Appendix. Respondent has conceded that there are no additions to tax or additional interest due from petitioners. Certain other concessions in the cases of Charles F. and Yvette M. Alexander (docket No. 15015-86) and Abe S. and Sara Rae Miller (docket No. 20875-86) are set forth in their respective stipulations of fact and in the parties' briefs. Respondent also concedes that petitioner Kathryn Molakides (docket No. 18367-86) is an "innocent spouse" and should be relieved from liability for any deficiency stemming from this case. The cases before us present issues related to five research and development limited partnerships: Blueprint Software (BS), Blueprint Software Professional (BSP), *170 Quoin Software (Quoin), Matrix Business Computers (Matrix), and Computech Research Investors, Ltd. (CRI). The year in issue for BS, BSP, Quoin, and Matrix is 1982, and the year in issue for CRI is 1980. All petitioners were limited partners in one or more of the partnerships, as set forth in the Appendix. The issues in dispute are as set forth below. 1) With respect to three [3] of the cases, we must first decide whether the notices of deficiency sufficiently placed in issue the second issue for decision. 2) That second issue is whether certain expenditures by CRI, BSP, and Matrix were paid or incurred in connection with a trade or business, within the meaning of section 174. [4] If so, then those petitioners that were limited partners in such partnerships *263 are entitled to deduct the expenditures as research or experimental expenditures. *171 3) The third issue for decision is whether any of the payees of promissory notes made by each of the five partnerships had an interest in the activities being financed, other than interests as creditors, within the meaning of section 465(a)(3)(A). If so, then those petitioners who were limited partners would not be "at risk" with respect to the portion of the bases of their partnership interests attributable to the notes. To the extent we hold that petitioners as limited partners were not at risk, their distributive shares of partnership losses are not deductible. See sec. 465(a). 4) Next, we must decide whether certain petitioners have proven that they are entitled to their distributive shares of the following deductions by the following partnerships: (a) Legal expenses of $ 15,000 and salaries of $ 8,500 by CRI (present in Harold and Dorothy Siner, docket No. 21085-86); (b) amortization expenses of $ 1,042 by BSP (present in Gerald J. Gleason, Jr., docket No. 20388-86); and (c) amortization expenses of $ 2,000 by Matrix. [5]
*172 5) Finally, six cases [6] before the Court include the last issue which is unrelated to the above issues stemming from partnership items. These six petitioners deducted "interest" paid on promissory notes they had issued to trusts they had established for the benefit of their children. We must decide whether these petitioners are entitled to deduct the payments as interest expense, under section 163. For convenience and clarity, we will discuss our Findings of Fact and Opinion by issue. GENERAL FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulations of fact and related exhibits are incorporated herein by this reference. All petitioners resided in California at the time *173 their petitions were filed with the Court, except for Charles F. and Yvette M. Alexander (docket No. 15015-86) who resided in Louisiana. I. Notices Of Deficiency
FINDINGS OF FACT A. Harold and Dorothy Siner
Harold Siner was a limited partner in CRI during 1980. CRI's partnership return (Form 1065) for 1980 reported a "research & development" [7] (R & D) deduction under section 174 of $ 1.4 million. Petitioners Harold and Dorothy Siner (the Siners), docket No. 21085-86, reported their distributive share of CRI's reported net loss on their 1980 return, in the amount of $ 40,325. In a partnership examination report dated April 30, 1984, respondent disallowed $ 850,000 of the $ 1.4 million R & D expenses reported by CRI. The report indicated that CRI entered into a $ 1.4 million contract with Business Systems Technology, Inc. for the development of computer software. The contract amount was paid with *174 $ 550,000 in cash and $ 850,000 by promissory note maturing on January 1, 1989. Respondent disallowed only the portion of the claimed R & D expenses attributable to the promissory note. By notice of deficiency dated March 27, 1986, respondent determined a deficiency in the Siners' Federal income tax for 1980. The deficiency was based upon disallowed medical and dental expenses, personal exemptions, and CRI losses. The disallowed losses included the Siners' share of all of CRI's R & D expenses claimed in 1980. The notice of deficiency contained only the following explanation: 9629 COMPUTECH PARTNERSHIP LOSS WE ADJUSTED YOUR RETURN IN ACCORDANCE WITH THE PARTNERSHIP RETURN, WHICH HAS ALSO BEEN EXAMINED. SHOWN ON RETURN OR AS PREV. ADJUSTED
$ (40,325.00)
CORRECTED AMOUNT
$ ( 57.00)
ADJUSTMENT
$ 40,268.00 Dennis R. DiRicco was co-counsel of record for the Siners in this case. Attorney DiRicco also provided legal counsel to CRI during the examination of its 1980 partnership return by respondent. On June 18, 1986, Attorney DiRicco filed a petition on the Siners' behalf with this Court. Neither the petition nor the answer mention the issue of whether *175 the trade or business requirement under section 174 was met. On June 26, 1987, respondent issued a second partnership examination report to CRI. The report expressed respondent's positions as follows: TPRIMARY POSITION: The fees to BST [a research company] were not paid in connection with a trade or business of the partnership but were in the nature of financing for the Western Business Computer's [a marketing company] project with Honeywell. The note is not allowed as part of the R&D expense. * * * ALTERNATIVE POSITION: The R&D deduction is limited to the cash paid if it is shown that the payments were made in connection with a business being carried on by the partnership. * * * Mr. DiRicco received a copy of the report, and filed a protest on behalf of CRI with respondent's Appeals Office in San Jose, California, on July 13, 1987. The notice of setting case for trial was issued on August 10, 1987, and the case was set for trial at the trial session beginning on January 11, 1988, in San Francisco, California. Both parties submitted trial memoranda which indicated their intention to try the trade or business issue. Trial of this case took place on January *176 14 and 15, 1988. B. Gerald J. Gleason, Jr.
Petitioner Gerald J. Gleason (Mr. Gleason), docket No. 20388-86, was a limited partner in BSP during 1982. BSP's partnership return (Form 1065) for 1982 reported an R & D deduction under section 174 of $ 803,500. Mr. Gleason reported his distributive share of BSP's net loss on his 1982 return, in the amount of $ 22,421. By notice of deficiency dated March 27, 1986, respondent determined a deficiency in Mr. Gleason's Federal income tax for 1982. The deficiency was based upon disallowed medical and dental expenses, and BSP losses. The disallowed losses included Mr. Gleason's share of all R & D expenses claimed by BSP in 1982. The notice of deficiency contained a number of very specific *264 alternative reasons supporting the determination, but did not contend that the trade or business requirement of section 174 was not satisfied. The notice did state: "You have not established that you are entitled to such loss(es) under any section of the Internal Revenue Code of 1954." On June 16, 1986, Mr. Gleason's counsel filed a petition on his behalf with the Court. The petition alleged error on respondent's part with *177 respect to certain of the specific alternative reasons for the deficiency determined in the notice of deficiency. Respondent denied these allegations in his answer. On January 13, 1988, Mr. Gleason's trial memorandum was filed with the Court. Neither the petition, the answer, nor Mr. Gleason's trial memorandum specifically raise the issue of whether BSP met the trade or business requirement under section 174. Respondent's trial memorandum, however, raises the section 174 issue. C. Robert M. and Alicia Herman
Like Mr. Gleason, petitioners Robert M. and Alicia Herman (the Hermans), docket No. 21097-86, were limited partners in BSP during 1982. The Hermans also reported their distributive share of BSP's net loss on their 1982 return, in the amount of $ 22,421. By notice of deficiency dated April 11, 1986, respondent determined a deficiency in the Hermans' Federal income tax for 1982. Respondent, however, disallowed only the Hermans' distributive share of the portion of the R & D expenses reported by BSP which were attributable to the promissory note. The notice of deficiency sent to the Hermans (like the one sent to Mr. Gleason) contained a number of very specific *178 alternative reasons supporting the determination, but did not contend that the trade or business requirement of section 174 was not satisfied. The notice did state (again, like the one sent to Mr. Gleason): "You have not established that you are entitled to such loss(es) under any section of the Internal Revenue Code of 1954." On June 18, 1986, the Hermans' counsel filed a petition on their behalf with the Court. The petition alleged error on respondent's part with respect to certain of the specific alternative reasons for the deficiency determined in the notice of deficiency. Respondent denied these allegations in his answer. Neither the petition nor the answer specifically raised the issue of deductibility of BSP expenditures under section 174. On November 12, 1987, respondent filed a motion for leave to file amendment to answer in the Herman case. Respondent sought to increase the amount of the deficiency by disallowing the Hermans' share of all R & D expenses reported by BSP, and to raise the issue of deductibility of the expenditures under section 174. By Memorandum Sur Order and Order dated December 21, 1987, we denied respondent's motion. On January 13, 1988, the *179 Hermans' trial memorandum was filed with the Court, and did not raise the section 174 issue, but respondent's trial memorandum did. OPINION A. Harold and Dorothy Siner
In the Siner case, the petitioners argue that the burden of proof with respect to the section 174 issue is on respondent because it constitutes a "new matter" under Rule 142(a). The essence of respondent's argument is that there is no new matter because the notice of deficiency sufficiently put in issue the section 174 trade or business requirement. We agree with respondent. Accordingly, the burden of proof as to the section 174 issue will remain on the Siners. Generally, the burden of proof is on the taxpayer. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Respondent bears the burden of proof, however, with respect to "any new matter, increases in deficiency, and affirmative defenses, pleaded in his answer * * * ." Rule 142(a). A new theory that is presented to sustain a deficiency is treated as a new matter when it either alters the original deficiency or requires the presentation of different evidence. Wayne Bolt and Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989). *180 A new theory which merely clarifies or develops the original determination is not a new matter in respect of which respondent bears the burden of proof. Wayne Bolt and Nut Co. v. Commissioner, supra.
Respondent cites a single case in support of his argument, Mayerson v. Commissioner, 47 T.C. 340 (1966), while the Siners cite none. In Mayerson, the taxpayer contended *265 that the burden of proof was not upon him because the notice of deficiency was so vague and indefinite that it did not constitute a determination. The primary basis for the taxpayer's contention was that the deficiency notice did not disclose respondent's reasons for his disallowance of the depreciation deductions in question. However, the notice of deficiency did state that the claimed depreciation deductions were not allowable under section 167. We held that the notice of deficiency was sufficient to put the claimed depreciation deductions in issue, and that the taxpayer had the burden of proof with respect to such issue. 47 T.C. at 348. However, we also indicated in Mayerson that: We might lend a more sympathetic ear to a taxpayer who *181 was not given adequate advance information of the respondent's position by either the notice of deficiency, the pleadings, or the opening statement so as to enable him to recognize and prepare for the factual issues. * * * Indeed, it seems obvious from the trial record that petitioner was well aware of the general issues in controversy, and no element of surprise to the detriment of his presentation could be detected. * * * [Mayerson v. Commissioner, 47 T.C. at 349.] The notice of deficiency in the Mayerson case specified the Code section upon which respondent based his disallowance. In the Siner case, the notice did not specify a section number or other authority upon which respondent was basing his disallowance of the R & D expenses. Rather, it simply stated that the Siners' return was being adjusted in accordance with CRI's return, which had also been examined. Venue for appeal of this case would lie in the Ninth Circuit. The Ninth Circuit has held that where a notice of deficiency specified that there were deficiencies and the amount of them, but did not mention a particular Code section as authority for the disallowance, the burden of proof was *182 not on the Commissioner. Abatti v. Commissioner, 644 F.2d 1385 (9th Cir. 1981), revg. a Memorandum Opinion of this Court. The court also found, however, that the taxpayers had fair warning before trial of the Commissioner's intent to rely on a particular Code section. 644 F.2d at 1389. Accordingly, consistent with both Mayerson and Abatti, we must consider whether the Siners received sufficient advance notification by respondent of his intent to rely on section 174 in order to allow them to adequately prepare for trial. If not, fairness dictates that respondent bear the burden of proof on such issue. Respondent argues that the Siners' assertion of surprise and prejudice is in conflict with the evidence in the record. The particular points made by respondent are: (1) CRI's return specifically mentioned section 174 as the authority for the claimed deductions, and that the Siners should be prepared to prove entitlement thereto; (2) the Siners' attorney also represented CRI and received the second partnership examination report of CRI dated June 27, 1987 (over six months before trial), which raised the section 174 issue; (3) the notice of *183 deficiency sent to the Siners disallowed their share of all R & D expenses reported by CRI, rather than only the portion financed by promissory notes, which is consistent with disallowance under section 174 and not just section 465; and (4) respondent's trial memorandum advised the Siners in writing that the section 174 issue would be raised at trial with respect to CRI. The Siners argue in their reply brief that "it is fundamentally unfair to permit Respondent to arbitrarily computer generate Notices of Deficiency that have no explanation or a broad explanation for proposed adjustments." The Siners concede that, with respect to CRI, they "introduced substantial evidence and testimony to support their position that the research expenditures were incurred in connection with its trade or business within the meaning of section 174." However, the Siners also argue that they did not adequately prepare to present evidence on the section 174 issue, and that they did so only because the Court reserved ruling at trial on whether the section 174 issue was properly before the Court. Respondent does not seek to increase the amount of the deficiency, for which he would certainly be required *184 to bear the burden of proof. See Rule 142(a). The notice of deficiency in the Siners' case was based upon the disallowance of all of CRI's R & D expenses, which is consistent with respondent's contention that the trade or business requirement under section 174 was not satisfied. Respondent did not disallow only the portion of the claimed R & D expenses attributable to the promissory note, which would have been appropriate if respondent intended to argue only that the Siners were not "at risk" under section 465. It is true that the evidence required for a taxpayer to make a case under section 174 is somewhat different than under section 465. However, the more pertinent factor present here is that the section 174 issue "is not inconsistent with some position necessarily implicit in the determination itself * * * ." Abatti v. Commissioner, 644 F.2d at 1390, citing Sorin v. Commissioner, 29 T.C. 959, 969 (1958), affd. per curiam 271 F.2d 741 (2d Cir. 1959). There is no new matter simply because a deficiency notice is broadly worded and the Commissioner later advances a theory not inconsistent with that language. Abatti v. Commissioner, supra. *185 *266 It is also true that respondent's trial memorandum was the first formal writing to advise the Siners that the section 174 issue would be raised at trial. However, the Siners' attorney (Dennis DiRicco) had actual notice over six months before trial that respondent intended to raise the section 174 issue, having received CRI's second partnership examination report. Respondent's delay in formally advising the Siners' counsel what he must have already known six months before trial is not an adequate basis for this Court to rule that the Siners did not have fair warning. See Abatti v. Commissioner, 644 F.2d at 1389. The Siners' ability to marshall "substantial evidence and testimony to support their position" at trial with respect to the section 174 issue supports our finding that the Siners in fact had fair warning. B. Gerald J. Gleason, Jr. Mr. Gleason argues that the notice of deficiency sent to him by respondent did not properly place in issue whether BSP was a trade or business, within the meaning of section 174. This is similar to the argument raised by the Siners, but Mr. Gleason does not ask that we place the burden of proof on this *186 issue to respondent. Rather, Mr. Gleason seems to request that we not consider the section 174 issue at all. As in the Siners' case, respondent disallowed all R & D expenses claimed by Mr. Gleason, which is consistent with respondent's contention that the trade or business requirement under section 174 was not satisfied. Respondent states in his opening brief that: "In his pretrial memorandum and in his opening statement, respondent's attorney advised the petitioners that it was respondent's position that the section 174 trade or business issue with respect to Blueprint Professional partnership was in the consolidated group of cases." There is no contention by respondent that counsel for Mr. Gleason was advised of respondent's position any earlier. We think that this factor distinguishes Mr. Gleason's case from that of the Siners. Petitioners did present evidence on the section 174 issue at trial, but contend that they could not adequately prepare. We apply a facts and circumstances test in determining whether a trade or business is present. Green v. Commissioner , 83 T.C. 667, 686 (1984). The trial of an issue which is factual in nature requires sufficient *187 advance notification in order to adequately prepare. Since respondent did not notify Mr. Gleason of his intention to argue the section 174 issue until his trial memorandum, we conclude that respondent should bear the burden of proof on such issue. See Florists' Transworld Delivery Assn. v. Commissioner, 67 T.C. 333, 347-348 (1976) . We are not inclined, however, to exclude the section 174 issue from our consideration, as Mr. Gleason suggests. C. Robert M. and Alicia Herman
Like Mr. Gleason, the Hermans request that we not consider the section 174 issue at all in their case. Respondent argues that the notice of deficiency sufficiently placed the section 174 trade or business requirement in issue. We previously denied respondent's motion for leave to file amendment to answer in the Hermans' case. [8] Respondent sought to increase the amount of the deficiency by disallowing the Hermans' share of all R & D expenses reported by BSP, and to raise the issue of deductibility of the expenditures under section 174. Now, respondent does not seek to increase the deficiency, but only to have us consider the section 174 issue. This we will not do. *188 In his notice of deficiency, respondent disallowed only the Hermans' distributive share of the portion of the R & D expenses reported by BSP which were attributable to the promissory note. This determination is consistent with respondent's argument under section 465, but is inconsistent with respondent's contention that the section 174 issue was raised in the notice. See Abatti v. Commissioner, 644 F.2d at 1390. Accordingly, we will not consider the section 174 issue in the Hermans' case. We recognize that both Mr. Gleason and the Hermans were limited partners in BSP and were represented by the same attorney at trial, but we will only consider the trade or business issue in Mr. Gleason's case. This result may appear anomalous, but it is nonetheless warranted. These cases were consolidated for trial, briefing, and opinion because petitioners' cases shared certain common issues of law and fact. See Rule 141(a). However, since separate notices of deficiency were issued to each petitioner, any question as to the sufficiency of notice must be considered separately. [9] The section 174 issue was consistent with respondent's determination in Mr. Gleason's case, *189 but was inconsistent with the determination in the Hermans' case. This *267 distinction is the basis for considering the section 174 issue in Mr. Gleason's case but not in the Hermans' case. II. Trade Or Business Under Section 174
FINDINGS OF FACT A. Computech Research Investors, Ltd. (CRI)
Messrs. Brian B. Lewis and William R. Rapoport were attorneys at law and partners in law firm of Rapoport and Lewis, with offices in Burlingame, California. On July 10, 1980, Computech Investments, Inc. (CI) was incorporated under California law. CI was formed for the stated purpose of acting as general partner of CRI and other computer research and development ventures, and to provide consulting advice to the general business community *190 regarding the ventures. Messrs. Lewis and Rapoport each owned 50 percent of CI's outstanding stock, and were its two directors. Mr. Lewis was the president and Mr. Rapoport was the secretary of CI. CI's principal place of business was at the law offices of Rapoport and Lewis in Burlingame, California. Also on July 10, 1980, Business Systems Technology, Inc. (BST) was incorporated under California law. BST was formed for the stated purpose of performing technological research and development activities. All of BST's outstanding stock was owned by Mr. Terry Marsh. BST's office was at the law offices of Rappoport and Lewis for the first eight or nine months of existence. On February 21, 1980, United Computech, Inc. was incorporated under California law, and later amended its articles of incorporation in order to use the name of Western Business Computers, Inc. (Western). Western was founded by Terry Marsh as its president for the purpose of marketing, selling, and distributing developed technology. Mr. Marsh orginally owned all of Western's outstanding stock, but in 1981 his ownership interest dropped to 78 percent of the outstanding stock. On July 22, 1980, CRI was formed *191 as a limited partnership under California law. The purpose of CRI, as stated in its partnership agreement, was "the development of computer products and the sale and/or licensing of its rights to same to a third party company or companies, and the Partnership may engage in any and all activities permitted by law that are related or incidental thereto." The sole general partner of CRI was CI, and Mr. Lewis was the initial limited partner. Additional limited partnership interests were later issued through a private placement to certain petitioners in this case, as set forth in the Appendix. CRI's principal place of business was also at the law offices of Rapoport and Lewis in Burlingame, California. The law firm of Rapoport and Lewis served as legal counsel to CI, BST, Western, CRI, and Terry Marsh. The law firm obtained the assistance of another firm in structuring the transaction and in preparing the tax opinion letter related thereto. The law firm was fired by Terry Marsh, BST, and Western in the latter part of 1981. Messrs. Lewis and Rapoport had no significant prior experience in the computer industry before forming CI and CRI. The private placement memorandum for CRI states, *192 however, that arrangements were made "to engage Robert D. Widergren as the representative of the Partnership [CRI] to assist the Partnership in developing the specifications for the development program and then to assist in monitoring the development program on behalf of the Partnership." Mr. Widergren had over 17 years of prior experience as an administrator, inventor, and engineer in the electronics area. While Mr. Widergren may have been involved in determining whether technology could be developed, he actually performed no role in monitoring development. By the time Terry Marsh had founded BST and Western in 1980, he had been actively involved in the marketing of small business computer systems for 15 years. He had previously worked as vice president of sales at the Quantel Corporation, national sales manager at the Microdata corporation, and had served in various managerial positions at the Singer corporation. Mr. Marsh was credited with having established nationwide sales networks of independent distributors at Singer and Microdata, and a worldwide network at Quantel. He had also established business relationships with various reputable computer software developers. *193 In addition to Mr. Marsh, the management of BST included Mr. Ronald Wu as director of software development. Mr. Wu previously had his own consulting business and worked in technical positions at the Honeywell and General Automation corporations. At Western, Mr. Marsh was joined by Mr. Paul Decker and Mr. Lee Adams as vice presidents. Messrs. Decker and Adams had previously served under Mr. Marsh as regional sales managers at the Quantel corporation. During the 1970's, significant technological advances took place in the computer industry, including the advent of the "minicomputer." These advances reduced the cost of computing power and opened up the small business computer market. The large computer companies, such as the Honeywell corporation, sought to penetrate the small business market. In order to do so, however, Honeywell needed to devise *268 ways to operate existing small business applications software on Honeywell hardware. CRI, CI, BST, and Western served the respective roles of financing, managing (as general partner of CRI), developing and marketing software aimed at meeting Honeywell's needs. The particular software to be developed included a prototype *194 compiler and certain application programs. The purpose of the prototype compiler was to render Honeywell's software operating system compatible with certain existing software in the small business market. Honeywell entered into an original equipment manufacturers contract with Western to market Honeywell products. Western also agreed to license Honeywell's operating system in return for a royalty. Honeywell supplied Western with over $ 200,000 in hardware to facilitate the research project. CRI entered into a management fee agreement with CI, an R & D agreement with BST, and a transfer of technology agreement with Western. Under the management fee agreement, CI received an annual management fee of $ 25,000 for 1980, $ 18,000 for 1981, and a fee of $ 1,500 per month thereafter. Under the R & D agreement, BST agreed to undertake research and development of the prototype software on behalf of CRI in return for $ 1.4 million. It was agreed that any technology developed by BST was the sole and exclusive property of CRI. The $ 1.4 million agreement price was payable to BST as follows: (1) $ 550,000 upon execution of the agreement by cashier's or certified check; and (2) $ 850,000 *195 by a non-interest bearing, recourse promissory note, due and payable on or before January 1, 1989. CRI agreed to pay the note to BST on the basis of 17 percent of royalties received by CRI attributable to the developed software. Under the transfer of technology agreement, CRI granted to Western a nonexclusive license to review for a 13-month period all technology developed under CRI's R & D agreement with BST. Prior to and during the review period, CRI agreed not to do anything that would jeopardize the pending exclusive rights of Western to the technology. Upon the payment of $ 10,000 to CRI, Western would be granted an option to acquire an exclusive, world-wide license to utilize the technology. The option was exercisable during the 90-day period following the termination of the 13-month review period. Upon exercise of the option, Western agreed to pay CRI a royalty. The royalty was equal to 1.5 percent of Western's annual gross sales of all products using the transferred technology until aggregate royalties reached $ 1.55 million, and thereafter, 1.25 percent of sales until aggregate royalties reached $ 5.05 million. Upon reaching aggregate royalties of $ 5.05 million, further *196 royalties would cease and Western would retain all right, title, and interest to the technology. Approximately 45 to 60 systems utilizing the developed technology were installed, yielding between $ 60,000 to $ 100,000 of royalties to CRI from Western, none of which was actually paid. CRI reported an R & D deduction of $ 1.4 million for the year 1980. CRI's reported total income and deductions on Form 1065, as amended, as follows: Year
Income
Deductions
Operating loss
1980
0
$ 1,425,417
$ 1,425,417  1981
0
31,567
31,567  1982
$ 10,000
12,225
2,225  1983
390
14,803
14,413  1984
3
10,017
10,014  1985
270
7,922
7,652  B. Blueprint Software Professional (BSP)
Mr. Dennis R. DiRicco was an attorney practicing law in San Mateo, California. He entered the private practice of law in 1979 after working for some years as a revenue agent, district conferee, and appellate conferee for the Internal Revenue Service. On September 1, 1982, BSP was formed as a limited partnership under California law and would remain in existence under its certificate of limited partnership until January 1, 1992, unless sooner terminated *197 upon the occurrence of certain specified events. The purpose of BSP, as stated in the certificate of limited partnership, was "to develop and market management level microcomputer software." Mr. DiRicco was the sole general partner of BSP, and limited partnership interests were issued to certain petitioners in this case, as set forth in the Appendix. BSP's principal place of business was at Mr. DiRicco's law office in San Mateo, California. Mr. Robert Garzee was majority shareholder and an officer of Management Blueprint Software, Inc. (MBS) and Synergistic Management Group, Inc. (SMG). Mr. Garzee was a consultant and international expert on the use of computers by non-technical users. MBS, a California corporation, was engaged in the process of developing the technology and methodology that will enhance the usage of micro-processors in various business applications. SMG, also a California corporation, specialized in the marketing of computer technology. *269 Mr. DiRicco served as legal counsel to BSP, MBS, SMG, and Robert Garzee. BSP, Mr. DiRicco, MBS, and SMG served the respective roles of financing, managing (as general partner of BSP), developing, and marketing *198 the software. Their collective objective was to develop and market microcomputer software that could be used by professionals, such as lawyers and accountants. To accomplish this objective, BSP entered into an R & D agreement with MBS and a transfer of technology agreement with SMG. Under the R & D agreement, MBS agreed to undertake the research program on behalf of BSP in return for $ 816,000. It was agreed that any technology developed by MBS under the agreement was the sole and exclusive property of BSP. The $ 816,000 was payable by BSP to MBS as follows: (1) $ 408,000 upon execution of the agreement, by cashier's or certified check; and (2) $ 408,000 by a non-interest bearing, full recourse promissory secured note, due January 1, 1993. At variance with the agreement, on August 1, 1982, BSP issued a non-interest bearing note in the principal sum of $ 396,000 to MBS, to be paid in full on July 31, 1991. Under the transfer of technology agreement, BSP granted to SMG a nonexclusive license to review for a 13-month period all technology developed under BSP's R & D agreement with MBS. Prior to and during the review period, BSP agreed not to do anything that would jeopardize *199 the pending exclusive rights of SMG to the technology. Upon the payment of $ 200 to BSP, SMG would be granted an option to acquire an exclusive, world-wide license to utilize the technology. The option was exercisable during the 90-day period following the termination of the 13-month review period. Upon exercise of the option, SMG agreed to pay BSP and MBS royalties equal to 30 percent and 70 percent, respectively, of SMG's net profits from all products utilizing the technology developed by MBS under the R & D agreement. The royalties were payable on a quarterly basis and would continue for the ten-year period following the date of the first payment of royalties from a particular product. BSP's private placement memorandum estimated a net profit return on initial products utilizing the developed technology of between $ 2,704,000 and $ 4,509,000, 30 percent of which would be BSP's royalty. BSP reported an R & D deduction of $ 803,500 for the year 1982. BSP actually reported total income and deductions on Form 1065 as follows: Year
Income
Deductions
Operating loss
1982
$ 2,123
$ 804,542
$ 802,419
1983
202
2,702
2,500
1984
0
2,500
2,500
1985
0
4,623
4,623
1986
0
2,375
2,375
*200 C. Matrix Business Computers (Matrix)
On September 1, 1982, Matrix was formed as a limited partnership under California law and would remain in existence under its certificate of limited partnership until January 1, 1991, unless sooner terminated upon the occurrence of certain specified events. The purpose of Matrix, as stated in its certificate of limited partnership, was "to engage in the general business of the research and development of computer software and such other activity or activities as are related or incidental thereto and as may be agreed upon from time to time by the Partners." Mr. George Jaynes was the sole general partner of Matrix, and limited partnership interests were issued to certain petitioners in this case, as set forth in the Appendix. Mr. Jaynes was a law school graduate who worked as an insurance broker, but had no prior experience in computer programming, marketing, or distribution. Mr. Jaynes was never formally removed as general partner of Matrix. After Matrix's formation, however, Attorney Dennis DiRicco actually took over all of Mr. Jaynes' duties as general partner and received one-half of any general partner fees paid by Matrix. *201 Brian E. Neth and Rodney M. Nishimura owned and operated Data Systems, Inc. (DS), a California corporation. Both Messrs. Neth and Nishimura had extensive experience in business data processing, and served the respective roles of president and vice president of DS. Employees of DS had previously worked with certain major computer firms in the areas of custom programming, system installation, and training end-users in a variety of business applications. In 1982, DS owned versions of several software packages which had been developed in concert with actual end-users. These software packages included systems for the following businesses and purposes: insurance agencies, medical clinics, distributors, manufacturing, general ledger, accounts payable, payroll, financial modeling, and property management. All software licenses were nonexclusive. The systems operated on computer hardware manufactured by Point 4 Data Corporation. DS was also a distributor of Point 4 computer hardware in the San Francisco Bay Area. Matrix Business Computers, Inc. (MBC), a California corporation, was owned by Messrs. Neth and Nishimura, Steven Courtney, and Geoffrey Stevens. Attorney Dennis Di Ricco *202 served as legal counsel to Matrix, George Jaynes (as general partner of Matrix), Brian Neth, DS, and MBC. Matrix, George Jaynes, DS, and MBC served the respective roles of financing, managing (as *270 general partner of Matrix), developing, and marketing developed software. Due primarily to the then current trend within the computer marketplace away from the "mini-computer" towards the "micro-computer," their initial collective objective was to develop and market a combined micro-computer software and hardware package for use by insurance companies. To accomplish this objective, Matrix entered into an R & D agreement with DS and a transfer of technology agreement with MBC on November 1, 1982. Under the R & D agreement, DS agreed to undertake the research program on behalf of Matrix in return for $ 660,000. It was agreed that any technology developed by DS under the agreement was the sole and exclusive property of Matrix. The $ 660,000 agreement price was payable by Matrix to DS as follows: (1) $ 330,000 upon execution of the agreement by cashier's or certified check; and (2) $ 330,000 by a non-interest bearing, full recourse promissory secured note, due January 1, 1991. *203 At variance with the agreement, on November 1, 1982, Matrix issued a full recourse, non-interest bearing note in the principal sum of $ 345,000 to DS, to be paid in full on January 1, 1991. The note stated that it was to "be secured by the personal assets of the Limited Partners in any manner and style" selected by DS. Under the transfer of technology agreement, Matrix granted to MBC a nonexclusive license to review for a 13-month period all technology developed under Matrix's R & D agreement with DS. Prior to and during the review period, Matrix agreed not to do anything that would jeopardize the pending exclusive rights of MBC to the technology. Upon the payment of $ 200 to Matrix, MBC would be granted an option to acquire an exclusive, world-wide license to utilize the technology. The option was exercisable during the 90-day period following the termination of the 13-month review period. Upon exercise of the option, MBC agreed to pay Matrix and DS royalties equal to 40 percent and 60 percent, respectively, of MBC's net profits of all products utilizing the technology developed by DS under the R & D agreement. The royalties were payable on a quarterly basis and would continue *204 for the six-year period following the date of first the first payment of royalties from a particular product. Matrix's private placement memorandum estimated a net profit of between $ 45,147,000 and $ 78,068,000 from products utilizing the developed technology, of which 40 percent would be Matrix's royalty. Matrix reported an R & D deduction of $ 632,000 for the year 1982. Matrix actually reported total income and deductions on Form 1065 as follows: Year
Income
Deductions
Operating loss
1982
0
$ 632,000 $ 632,000  1983
$ 1,974
7,974 6,000  1984
0
6,000 6,000  1985
0
6,000 6,000  1986
0
6,000 6,000  OPINION The operative facts as we find them governing the deductibility of research or experimental expenditures by CRI, BSP, and Matrix are so similar that we will consider the partnerships together. Petitioners bear the burden of proof (Rule 142(a)) except for Mr. Gleason, based upon our ruling discussed above. [10]
*205 Section 174(a)(1) provides generally that: A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to [a] capital account. The expenditures so treated shall be allowed as a deduction. In Snow v. Commissioner, 416 U.S. 500 (1974), the Supreme Court established that a taxpayer need not currently be producing or selling a product in order to obtain a deduction under section 174. The Supreme Court compared section 174 with section 162 stating that: Congress wrote into section 174(a)(1) "in connection with," and section 162(a) is more narrowly written than is section 174, allowing "a deduction" of "ordinary and necessary expenses paid or incurred * * * in carrying on any trade or business." * * * [416 U.S. at 503.] This "interpretation of section 174(a)(1) fairly invited the creation of R & D tax shelters, and the bar quickly took up the invitation." Spellman v. Commissioner, 845 F.2d 148 (7th Cir. 1988), affg. T.C. Memo. 1986-403. Ten years after Snow, this Court *206 observed in Green v. Commissioner, 83 T.C. 667 (1984), that: For section 174 to apply, the taxpayer must still be engaged in a trade or business at some time, and we must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business * * * [83 T.C. at 686-687. Emphasis in original.] *271 The grant of an exclusive license to exploit technology prior to commencement of research or experimentation effectively precludes a licensor from ever surpassing investor status by engaging in a trade or business with respect to the technology. Spellman v. Commissioner, T.C. Memo. 1986-403, affd. 845 F.2d 148 (7th Cir. 1988); Levin v. Commissioner, 87 T.C. 698, 726-727 (1987), affd. 832 F.2d 403 (7th Cir. 1987). In the cases of CRI, BSP, and Matrix, the transfer of technology and R & D agreements included direct references to each other and were entered into at about the same times. However, the transfer of technology agreements did not *207 provide for the immediate grant of exclusive licenses, but rather the grant of nonexclusive review licenses coupled with options to acquire the technology developed under the R & D agreements. Therefore, the possibility existed under the transfer of technology agreements that the licensees would not exercise the options and the limited partnerships would thus not be precluded from ever engaging in trades or businesses. This Court recently faced the issue of the treatment of an option to acquire a license to technology in Diamond v. Commissioner, 92 T.C. 423 (1989). In Diamond, the Commissioner argued that there was either an immediate sale or exchange of all rights or the grant of an exclusive license to the subject technology. The taxpayer contended that there was merely an option to acquire a license, and since there was a possibility that the optionee would not exercise its right, the door was open for the taxpayer or the partnership to exploit the results of the research. Unlike Diamond, it is clear in this case that options to acquire exclusive licenses are present. In Diamond, however, we held that even if the subject provision constituted an *208 option, "there is no realistic prospect that [the technology] would ever be exploited in any trade or business carried on by any one other than [the would-be licensee]." 92 T.C. at 439. In so holding, we adopted the reasoning of the Seventh Circuit in Spellman v. Commissioner, supra.
In Spellman, the Circuit Court provided the following discussion regarding Sci-Med (the limited partnership) and Teva (the research and marketing company): Teva's option to acquire for only $ 20,000 all rights in the byproducts will prevent Sci-Med as a practical matter from ever entering the pharmaceutical business as a result of the venture with Teva. If the byproducts turn out to be worth more than $ 20,000, Teva will exercise the option and Sci-Med will have no products to make or sell; if the byproducts turn out to be worth less, Sci-Med will have the right to market them but will not exercise the right because the costs would exceed the possible profits. * * * [845 F.2d at 151.] The transfer of technology agreements entered into by CRI, BSP, and Matrix provided that options to acquire exclusive licenses to all technology developed under the *209 R & D agreements could be obtained upon the payment of $ 10,000, $ 200, and $ 200, respectively. Sound business judgment dictates that the marketing companies (as optionees) would surely exercise the options if anticipated profits from the exploitation of the technology exceeded the option prices, and would decline to exercise the options if anticipated profits were less than the option prices. Given the nominal cost of the options to acquire the exclusive licenses, the partnerships were "prevented from engaging in the particular trade or business either by the law of contracts or the laws of economics." Diamond v. Commissioner, 92 T.C. at 441. Accordingly, we find that there was "no realistic prospect" that the developed software would ever be exploited by anyone other than the marketing companies. See Diamond v. Commissioner, 92 T.C. at 439. We have considered the remote possibility that CRI, BSP, and Matrix could profitably exploit the technology while the optionees could not. In such a case, the optionees' failure to exercise their options would leave the door open for the partnerships to engage in trades or businesses through the exploitation *210 of the developed software. The evidence clearly shows, however, that the partnerships (through their general partners) never intended, nor were capable of, engaging in trades or businesses with respect to the software technology. Stated otherwise, the partnerships never intended to, nor ever did, go beyond the role of mere investors. The management of investments is not a trade or business irrespective of the extent of the investments or the amount of time required to perform the managerial functions. Higgins v. Commissioner, 312 U.S. 212 (1941). The R & D agreements, transfer of technology agreements, and other documents entered into by CRI, BSP, and Matrix which are in evidence make crystal-clear that the partnerships' intent was to sit back and have others develop and ultimately market the software in return for royalties. Nevertheless, petitioners presented evidence in order to show that the general partners of the partnerships were actively involved in the development and marketing of the software. The general partners, however, included attorneys and an insurance broker, none of which had any significant training or experience in the technological or marketing *211 *272 aspects of computer software. Any involvement by the general partners was either insignificant or was directed at investment management. We also reject the suggestion by petitioners that the partnerships may have been in the trade or business of exploiting inventions through regular licenses and sales. See Avery v. Commissioner, 47 B.T.A. 538 (1942). Instead, we are convinced that the partnerships intended to be involved in nonrecurring "one-shot deals." Accordingly, we hold that the research or experimental expenditures of CRI, BSP, and Matrix were not paid or incurred in connection with trades or businesses, as is required by section 174. We reach this decision in the case of BSP notwithstanding that respondent bore the burden of proof. The Alexanders (docket No. 15015-86) and the Siners (docket No. 21085-86) are the only petitioners before us who were limited partners in CRI. In his opening brief, respondent conceded the deficiencies determined in the Alexanders' case with respect to CRI for 1981 and 1982. In the Siners' case, the effect of our decision that the trade or business requirement of section 174 was not met is to disallow all claimed *212 research or experimental expenditures. Accordingly, we need not address the next issue regarding whether the Alexanders and Siners were at risk with respect to the portion of the bases of their CRI partnership interests attributable to promissory notes assumed by them. III. "At Risk" Under Section 465
FINDINGS OF FACT A. Blueprint Software Professional (BSP)
On August 1, 1982, BSP issued a non-interest bearing and fully recourse promissory note in the principal sum of $ 396,000 to MBS (the research company), to be paid in full on July 31, 1991. The petitioners who were limited partners in BSP entered into "Assumption Agreements" with BSP. Under such agreements, each limited partner personally assumed liability for his/her proportionate share of all indebtedness incurred by BSP under its R & D agreement with MBS. As discussed above, BSP entered into a transfer of technology agreement with SMG. Under such agreement, BSP granted to SMG a nonexclusive license to review technology developed by MBS under the R & D agreement and an option to acquire an exclusive, worldwide license to the technology. If the option were exercised, SMG agreed to pay BSP and MBS royalties *213 equal to 30 percent and 70 percent, respectively, of SMG's net profits from all products utilizing the technology developed by MBS under the R & D agreement. The royalties were payable on a quarterly basis and would continue for the ten-year period following the date of the first payment of royalties from a particular product. *273 In addition, under the R & D agreement between BSP and MBS, MBS granted to BSP -- a nonexclusive license to any and all necessary background data, trade secrets, know-how and any other technology, whether patented or not, necessary or useful in the further development or the manufacture, use, or marketing, whether by sale, lease or other disposition, of each item of Technology released from the Research Program * * * In consideration for such nonexclusive license, [BSP] shall pay to [MBS] an annual royalty, stated as a percentage of net sales, based upon an appraisal of the fair market value of the license. * * * The transfer of technology agreement stated that the nonexclusive review license and exclusive license from BSP to SMG included an exclusive irrevocable license from BSP to SMG to "any and all necessary background *214 data, trade secrets, know-how or any other technology, whether patented or not" licensed to BSP by MBS under the R & D agreement. In consideration therefor, SMG agreed to pay BSP "a royalty equal to, and payable over the same period of time as, the royalty payable by [BSP] to [MBS] for such background data, trade secrets, know-how and other Technology pursuant to * * * [the R & D agreement]." B. Matrix Business Computers (Matrix)
On November 1, 1982, Matrix issued a non-interest bearing and fully recourse promissory note in the principal sum of $ 345,000 to DS (the research company), to be paid in full on January 1, 1991. The petitioners who were limited partners in Matrix entered into "Assumption Agreements" with Matrix. Under such agreements, each limited partner personally assumed liability for his/her proportionate share of all indebtedness incurred by Matrix under its R & D agreement with DS. As discussed above, Matrix entered into a transfer of technology agreement with MBC. Under such agreement, Matrix granted to MBC a nonexclusive license to review technology developed by DS under the R & D agreement and an option to acquire an exclusive, world-wide *215 license to the technology. If the option were exercised, MBC agreed to pay Matrix and DS royalties equal to 40 percent and 60 percent, respectively, of MBC's net profits from all products utilizing the technology developed by DS under the R & D agreement. The royalties were payable on a quarterly basis and would continue for the six-year period following the date of first the first payment of royalties from a particular product. In addition, under the R & D agreement between Matrix and DS, DS granted to Matrix -- a nonexclusive license to any and all necessary background data, trade secrets, know-how and any other technology, whether patented or not, necessary or useful in the further development or the manufacture, use, or marketing, whether by sale, lease or other disposition, of each item of Technology released from the Research Program * * * In consideration for such nonexclusive license, [Matrix] shall pay to [DS] an annual royalty, stated as a percentage of net sales, based upon an appraisal of the fair market value of the license. * * * The transfer of technology agreement stated that the nonexclusive review license and exclusive license from Matrix to MBC included *216 an exclusive irrevocable license from Matrix to MBC to "any and all necessary background data, trade secrets, know-how or any other technology, whether patented or not" licensed to Matrix by DS under the R & D agreement. In consideration therefor, MBC agreed to pay Matrix "a royalty equal to, and payable over the same period of time as, the royalty payable by [Matrix] to [DS] for such background data, trade secrets, know-how and other Technology pursuant to * * * [the R & D agreement]." C. Blueprint Software (BS)
On August 15, 1981, BS was formed as a limited partnership under California law. The general partner of BS was Attorney Dennis DiRicco, and limited partnership interests were issued to certain petitioners in this case, as set forth in the Appendix. In 1981, BS (as in the case of BSP discussed above) entered into an R & D agreement with MBS and a transfer of technology agreement with SMG. Their collective objective was to develop and market microcomputer software for use as a management tool by non-technical users. Under the R & D agreement, MBS agreed to undertake the research program on behalf of BS in return for $ 600,000. It was agreed that *217 any technology developed by MBS under the agreement was the sole and exclusive property of BS. The $ 600,000 agreement price was payable by BS to MBS as follows: (1) $ 300,000 upon execution of the agreement by cashier's check or certified check; and (2) $ 300,000 by a non-interest bearing, full recourse promissory note, due January 1, 1990. In 1982, BS agreed to provide MBS with an additional $ 103,250 as further compensation for the research and development services, half of which was paid in cash and the balance by promissory note dated December 1, 1982. The note was non-interest bearing in the principal sum of $ 51,625, to be paid in full on January 1, 1990. The petitioners who were limited partners in BS entered into "Assumption Agreements" with BS. Under such agreements, each limited partner personally assumed liability for his/her proportionate share of all indebtedness incurred by BS under its R & D agreement with MBS. Under the transfer of technology agreement, BS granted to SMG a nonexclusive license to review for a 13-month period all technology developed under BS's R & D agreement with MBS. Upon the payment of $ 200 to BS, SMG would be granted an option to acquire *218 an exclusive, world-wide license to utilize the technology. The option was exercisable during the 90-day period following the termination of the 13-month review period. Upon exercise of the option, SMG agreed to pay BS and MBS royalties equal to 30 percent and 70 percent, respectively, of SMG's net profits from all products utilizing the technology developed under the R & D agreement. The royalties were payable on a quarterly basis and would continue for the ten-year period following the date of the first payment of royalties from a particular product. In addition, under the R & D agreement between BS and MBS, MBS granted to BS -- a non-exclusive license to any and all necessary background data, trade secrets, know-how and any other technology, whether patented or not, necessary or useful in the further development or the manufacture, use, or marketing, whether by sale, lease or other disposition, of each item of Technology released from the Research Program * * * In consideration for such non-exclusive license, [BS] shall pay to [MBS] an annual royalty, stated as a percentage of net sales, based upon an appraisal of the fair market value of the license. * * * The transfer *219 of technology agreement stated that the nonexclusive review license and exclusive license from BS to SMG included an exclusive irrevocable license from BS to SMG to "any and all necessary background data, trade secrets, know-how or any other technology, whether patented or not" licensed to BS by MBS under the R & D agreement. In consideration therefor, SMG agreed to pay BS "a royalty equal to, and payable over the same period of time as, the royalty payable by [BS] to [MBS] for such background data, trade secrets, know-how and other Technology pursuant to * * * [the R & D agreement]." *274 D. Quoin Software (Quoin)
On May 1, 1982, Quoin was formed as a limited partnership under California law. The general partner of Quoin was Attorney Dennis DiRicco, and limited partnership interests were issued to certain petitioners in this case, as set forth in the Appendix. Computer Systems Development, Inc. (CSD), a California corporation, specialized in the research design, development, and sale of software, as well as the design and sale of computer systems for a wide variety of business applications. The Language Company, Inc. (TLC), also a California corporation, *220 was a wholly-owned subsidiary of CSD, specializing in the research, development, and sale of designated computer systems. On April 14, 1982, CSD (the predecessor in interest of TLC) contracted with SMC Systems and Technology, Inc. (SMC) for a nonexclusive license to use and modify the SMC Basic Software owned by SMC, with the results thereof to be owned jointly by CSD and SMC. Later in 1982, Quoin entered into an R & D agreement with CSD and TLC, and a transfer of technology agreement with TLC. Their collective objective was to develop a "translator" that would allow Basic-4 (a major computer supplier) software to be used on Digital Equipment Corporation computers and compatibles. Under the R & D agreement, CSD and TLC agreed to undertake the research program on behalf of Quoin in return for $ 400,000. In addition, under the R & D agreement, CSD/TLC granted to Quoin -- a non-exclusive license to any and all necessary background data, trade secrets, know-how and any other technology, whether patented or not, necessary or useful in the further development or the manufacture, use, or marketing, whether by sale, lease or other disposition, of each item of Technology released from *221 the Research Program * * * In consideration for such license, [Quoin] shall pay to [CSD/TLC] an annual royalty, stated as a percentage of net sales, based upon an appraisal of the fair market value of the license. * * * It was agreed that any technology developed under the agreement was the sole joint property of Quoin and CSD/TLC. Quoin acknowledged that any rights it may acquire to the technology were subject to the licensing agreement entered into between CSD and SMC. The $ 400,000 agreement price was payable by Quoin as follows: (1) $ 200,000 upon execution of the agreement by cashier's check or certified check made payable to CSD; and (2) $ 200,000 by a non-interest bearing, full recourse promissory note, due January 1, 1991. On May 1, 1982, Quoin issued the promissory note to CSD/TLC. The petitioners who were limited partners in Quoin entered into "Assumption Agreements" with Quoin. Under such agreements, each limited partner personally assumed liability for his/her proportionate share of all indebtedness incurred by Quoin under its R & D agreement with CSD/TLC. Under the transfer of technology agreement, Quoin granted to TLC a nonexclusive license to review *222 for a 13-month period all technology developed under the R & D agreement. Upon the payment of $ 200 to Quoin, TLC would be granted an option to acquire an exclusive, world-wide license to utilize the technology. The option was exercisable during the 90-day period following the termination of the 13-month review period. Upon exercise of the option, TLC agreed to pay Quoin for six years royalties equal to 40 percent of TLC's net profits from all products utilizing the technology developed under the R & D agreement. Oddly enough, TLC also agreed to pay itself a royalty equal to an "agreed to percentage" of TLC's net profits from all products utilizing the technology. OPINION Section 465 was enacted as part of the Tax Reform Act of 1976 (TRA 76). Sec. 204, TRA 76, Pub. L. 94-455, 90 Stat. 1520, 1531. In general, any loss from an activity governed by section 465 is allowed only to the extent of the aggregate amount with respect to which the taxpayer is "at risk" (sec. 465(b)) [11] for such *275 activity at the close of the taxable year. Sec. 465(a). Any disallowed loss is allowable as a deduction in subsequent taxable years in which the taxpayer is considered to be at risk. *223 Sec. 465(b)(5). Section 465 applies to each activity engaged in by a taxpayer in carrying on a trade or business or for the production of income. Sec. 465(c)(3)(A). *224 A taxpayer is considered at risk for an activity with respect to (1) the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, and (2) with certain limitations, amounts borrowed with respect to such activity. Sec. 465(b). One such limitation is found in section 465(b)(3)(A), which provided that amounts borrowed for use in an activity are not considered to be at risk if such amounts are borrowed from a person who "has an interest (other than an interest as a creditor) in such activity." Respondent concedes that the promissory notes issued by each of the partnerships pursuant to their R & D agreements represent bona fide indebtedness for Federal tax purposes. [12] Respondent further concedes that petitioners were personally and primarily liable for the notes pursuant to the terms of the assumption agreements, and were thus entitled to include in the basis of their respective partnership interests their allocable share of liability. Respondent argues, however, that each payee of the promissory notes in question had an interest in the activity being financed, other than an interest as a creditor, within the meaning of section 465(b)(3)(A). *225 Petitioners argue that section 465(b)(3) of the Internal Revenue Code (Code) contains a typographical error. Petitioners claim that the legislative history to TRA 76 indicates that the reference in Code section 465(b)(3) to paragraph "(1)(B)" should instead read paragraph "(2)(B)." (See footnote 11, supra.) Assuming petitioners are correct, section 465(b)(3)(A) does not apply where the amount *226 borrowed is through a fully recourse note. Since respondent conceded that the promissory notes in question were fully recourse against petitioners, petitioners contend that respondent has also conceded the entire issue before us. Since this argument was first raised by petitioners in their reply brief, respondent and petitioner were granted permission by the Court to file supplemental reply briefs addressing this issue. Petitioners correctly point out that at certain stages in the history of the bill that eventually became TRA 76, proposed Code section 465(b)(3) provided a reference to paragraph "(2)(B)." See H.R. 10612, 94th Cong., 2d Sess. 76 (1976); S. Rept. No. 938, 94th Cong., 2d Sess. (1976), 1976-3 C.B. 49, 50. Before the bill was sent to the President for his signature, however, both Houses of Congress agreed to concurrent resolutions to correct the bill which provided that: "In section 465(b)(3) of the Code * * * strike out 'paragraph (2)(B)' and insert 'paragraph (1)(B)'." H. Con. Res. 751, 94th Cong., 2d Sess., 122 Cong. Rec. 30,860-30,862 (Sept. 16, 1976); S. Cong. Res. 751, 94th Cong., 2d Sess., 122 Cong. Rec. 30,731 (Sept. 16, 1976). The corrected text *227 is set forth in the United States Statutes at Large. Sec. 204, TRA 76, Pub. L. 94-455, 90 Stat. 1520, 1531. The volumes of the Statutes at Large are "legal evidence" of the laws contained therein and are accepted as proof of those laws in any court in the United States. 1 U.S.C. Sec. 112 (1982); Bear v. United States, 611 F.Supp. 589, 599 n. 18 (D.Neb. 1985), affd. 810 F.2d 153 (8th Cir. 1987). The text of Code section 465(b)(3) is identical to the text contained in the Statutes at Large. Accordingly, we find petitioners' typographical error argument to be without merit. We next consider whether each payee of the promissory notes in question issued by BSP, Matrix, BS, and Quoin had an interest in the activities being financed, other than an interest as a creditor, within the meaning of section 465(b)(3)(A). The language "interest (other than an interest as a creditor)" is not defined in section 465 or in the committee reports accompanying TRA 76. The General Explanation of TRA 76 suggests that any type of financial interest in the activity (other than as a creditor) would constitute a prohibited "other interest" under section *228 465. Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1976, at 39, 1976-3 C.B. (Vol. 2) 51; Bennion v. Commissioner, 88 T.C. 684, 696 (1987). *276 In 1979, the Treasury proposed regulations which provided that a lender will be deemed to have an "interest (other than an interest as a creditor)" if the lender has either a capital interest or a net profits interest in the activity. Sec. 1.465-8(b), [13] Proposed Income Tax Regs., 44 Fed. Reg. 32239 (June 5, 1979). These proposed regulations have yet to be finalized and, therefore, are not authoritative. However, this Court has utilized the two tests in the proposed regulations as a guideline in determining whether any of the creditors in a transaction have the prohibited interest. Levy v. Commissioner, 91 T.C. 838 (1988); Larsen v. Commissioner, 89 T.C. 1229 (1987); Bennion v. Commissioner, supra; Waddell v. Commissioner, 86 T.C. 848 (1986), affd. 841 F.2d 264 (9th Cir. 1988); Jackson v. Commissioner, 86 T.C. 492 (1986), affd. 864 F.2d 1521 (10th Cir. 1989). *229 *230 We have stated that the apparent policy underlying section 465(b)(3)(A) -- was to exclude from at-risk amounts those amounts that are borrowed from creditors who, because of the nature of their continuing other interests in the activity, would not be likely to act as independent creditors with respect to the debt owed to them. * * * Creditors who hold recourse obligations, but who also have certain other interests in the activity, might disregard their rights thereunder in favor of protecting or enhancing their other interests in the activity. In light of that eventuality and in spite of the otherwise recourse nature of the debt, taxpayers who owe recourse debt obligations to such creditors are not to be regarded as at risk with respect thereto. [Bennion v. Commissioner, 88 T.C. at 697-698.] BSP, Matrix, BS, and Quoin (partnerships) entered into R & D agreements with MBS, DS, MBS, and CSD/TLC (research companies), respectively, and transfer of technology agreements with SMG, MBC, SMG, TLC (marketing companies), respectively. Under the R & D agreements, the partnerships issued fully recourse promissory notes to their respective research companies. Petitioners *231 who were limited partners in the partnerships assumed personal liability for the notes. Accordingly, in the event of default, the research companies had recourse against both their respective partnerships and limited partners that had assumed liability. The lone fact that the limited partners were personally liable on the notes, however, does not necessarily mean that they were also at risk for purposes of section 465. If the research companies, as creditors, also held interests in the activities other than as creditors, then the amounts borrowed are not considered to be at risk. See Sec. 465(b)(3)(A). In deciding whether the research companies held interests in the activities other than as creditors, we will examine the two royalty arrangments to which the research companies possessed rights. Under the first royalty arrangement, the research companies granted nonexclusive licenses to the partnerships to necessary background data, trade secrets, know-how, and any other technology, in return for royalties from the partnerships, stated as a percentage of net sales, based upon an appraisal of the fair market of the license. We have held that the requisite interest other than as *232 a creditor must be either a capital interest in the activity, or an interest in the net profits of the activity. Larsen v. Commissioner, 89 T.C. at 1270, citing Jackson v. Commissioner, 86 T.C. at 529. An interest in gross receipts or gross sales is not considered an interest in net profits. Sec. 1.465-8(b)(4), Example (2), Proposed Income Tax Regs., supra; see Pritchett v. Commissioner, T.C. Memo. 1989-21, on remand 827 F.2d 644 (9th Cir. 1987). The royalties in question were based upon "net sales," which was not defined in the agreements. However, "net sales" is commonly defined as gross sales less returns and allowances, freight-out, and often cash discounts allowed, while "net profit" is what remains from revenue after deducting all related costs. Thus, an interest in net sales is not an interest in net profits, but rather is more akin to a gross receipts interest. Accordingly, the royalties based upon net sales did not give rise to prohibited interests, for purposes of section 465(b)(3)(A). Under the second royalty arrangement, if the marketing companies were to exercise their *277 options to obtain *233 exclusive licenses, then the research companies would receive royalties from the marketing companies based upon the net profits from all products utilizing the technology developed under the R & D agreements. [14] The proposed regulations (which we follow as a guideline) provide that an interest in the net profits of an activity may exist even though the lender does not possess any incidents of ownership in the activity. For example, an employee or independent contractor whose compensation is in whole or in part determined with reference to the net profits of the activity is described as having an interest in the net profits of the activity. Sec. 1.465-8(b)(3), Proposed Income Tax Regs., supra. (See footnote 13, supra.) Since the royalties in question were based upon net profits, we think it is clear that all the research companies had interests in the activities, other than interests as creditors, within the meaning of section 465(b)(3)(A). Accordingly, we hold for respondent on this issue with respect to BSP, Matrix, BS, and Quoin. *234 IV. Entitlement To Certain Deductions
FINDINGS OF FACT A. Computech Research Investors, Ltd. (CRI)
For the taxable year 1980, CRI reported (on Form 1065) deductions for salaries to partners of $ 10,000 and legal and professional fees of $ 15,000. In 1980, the amount for salaries was paid to CRI's general partner (as authorized under CRI's partnership agreement), and the legal and professional fees were paid to the law firm of Rapoport and Lewis. In a partnership examination report dated April 30, 1984, respondent disallowed $ 8,500 of the deduction for salaries to partners and the entire deduction for legal and professional fees. The report proposed that the disallowed deductions be reallocated between syndication fees and amortizable organization costs. Harold and Dorothy Siner (docket No. 21085-86) were limited partners in CRI and claimed a distributive share of CRI losses for 1980 of $ 40,325. By notice of deficiency dated March 27, 1986, respondent determined a deficiency in the Siners' Federal income tax for 1980. The deficiency was based upon the disallowance of $ 40,268 of the CRI losses claimed by the Siners. B. Blueprint Software Professional *235 (BSP)
For the taxable year 1982, BSP reported a deduction of $ 1,042, which was explained on the partnership return (Form 1065) as follows: As prescribed by Section 248(a) of the Internal Revenue Code of 1954 * * *, Taxpayer hereby elects to amortize all organizational and incorporation expenditures ratably over a period of not less than or greater than sixty (60) months. Amount
-
$ 12,500
Period
-
60 Months
Current
-
$ 1,042
Prior
-
$ -0-  * * * Gerald J. Gleason (docket No. 20388-86) was a limited partner in BSP during 1982. Mr. Gleason reported his distributive share of BSP's net loss in 1982 on his 1982 return in the amount of $ 22,421. By notice of deficiency dated March 27, 1986, respondent determined a deficiency in Mr. Gleason's Federal income tax for 1982. The deficiency was based in part upon the disallowance of Mr. Gleason's entire distributive share of BSP losses for 1982. C. Matrix Business Computers (Matrix)
For the taxable year 1982, Matrix reported (on Form 1065) an amortization expense deduction of $ 2,000. By separate notices of deficiency, respondent determined deficiencies *236 in certain petitioners' (see footnote 6, supra) Federal income taxes for 1982. The deficiencies were based upon the disallowance of the petitioners' entire distributive shares of Matrix losses for 1982. OPINION Respondent argues in his opening brief that petitioners have submitted no evidence to show that respondent's determination disallowing certain deductions by CRI, BSP, and Matrix was in *278 error. In their reply brief, petitioners replied to respondent's arguments with respect to CRI by contending only that the record shows that they are entitled to the disallowed deductions. As a general rule, the determinations of the Commissioner are presumed to be correct, and the taxpayer bears the burden of proving that such determinations are in error. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). However, the burden of proof is on the Commissioner with respect to any "new matter." Rule 142(a). In Mr. Gleason's case, we placed the burden of proof on respondent to show that BSP did not satisfy the trade or business requirement of section 174. For the same reasons, we will similarly place the burden of proof on respondent to show that Mr. *237 Gleason was not entitled to his claimed distributive share of organizational expense amortization by BSP. With respect to the disallowed deductions of CRI and Matrix, however, petitioners bear the burden of proof. The Siners have proven that the deductions of CRI that were disallowed by respondent were actually paid in 1980. However, the Siners have failed to prove that respondent erred in determining that the disallowed deductions should be reallocated between syndication fees and amortizable organization costs. See Sec. 709. Accordingly, we uphold respondent's determination as correct. In contrast, respondent has failed to prove that Mr. Gleason is not entitled to deduct his share of the claimed amortization expense in 1982. [15] Accordingly, we hold for Mr. Gleason on this issue. Finally, with respect to Matrix, petitioners presented no evidence or argument *238 to support their claim to the $ 2,000 amortization expense deduction. Accordingly, we uphold respondent's determination as correct. V. Deductibility Of Interest Payments To Trusts
FINDINGS OF FACT Mr. DiRicco drafted a separate "Declaration of Trust" (Trust) for each of six petitioners before us on this issue. (See footnote 6, supra.) [16] The taxable year 1982 is in issue with respect to all six petitioners, and the taxable year 1981 is also in issue with respect to Charles F. and Yvette M. Alexander, docket No. 15015-86. Since the terms of the six Trusts and the manner in which they were operated are virtually identical, we will consider them together. In each case, petitioners were trustors and Mr. DiRicco served as trustee. Petitioners each irrevocably transferred a sum of cash to the Trusts which was to constitute Trust corpus. As trustee, Mr. DiRicco agreed to hold, administer, and distribute the corpora in accordance with the terms of the Trusts. In each case, the named beneficiaries were the petitioners' children. The Trusts stated that they were to be governed *239 by the laws of California. Each Trust essentially provided for distributions of net income and capital gains at least annually to, or for the benefit of, the named beneficiaries until termination of the Trust. However, if Mr. DiRicco (as trustee) determined that there existed a compelling reason to postpone distribution, he could do so until the reason for postponement ceased to exist or the beneficiaries reached the age of 18. The Trusts would terminate upon the earlier of the expiration of ten years and one month after the date of its creation or the death of the named beneficiaries. Upon termination, the Trusts provided that all trust corpora and accumulated and undistributed income in the hands of Mr. DiRicco (as trustee) would be transferred back to petitioners (as trustors) or their estates. [17]
*240 In each case, on the same day that petitioners transferred cash to the Trusts (or shortly thereafter), Mr. DiRicco would return the cash back to petitioners in exchange for one-year promissory notes, bearing an interest rate of 20 percent. When the notes matured, petitioners would pay the "interest" due, and in some cases Mr. DiRicco would return the amounts paid in exchange for additional promissory notes. When petitioners' children (as beneficiaries) needed funds for purposes authorized by the Trusts, petitioners would pay cash to the Trusts and Mr. DiRicco would distribute funds to, or for the benefit of, the children. *279 On January 4, 1982, each of the six petitioners issued a promissory note due December 31, 1982, to Mr. DiRicco as trustee for their respective Trusts. The notes stated that the following principal and interest was due at maturity: Petitioner
Docket No.
Principal
Interest
Alexander
15015-86
$ 24,000
$ 4,800
Antel
20946-86
24,000  4,800  Brooks
20497-86
7,200   1,440  Fink
21099-86
21,600  4,320  Hetzel
21102-86
12,000  2,400  Weitzman
20291-86
24,000  4,800  All six *241 petitioners deducted the interest on Schedule A of their 1982 Federal income tax returns, Forms 1040. The Alexanders also claimed an interest deduction of $ 4,000 on their 1981 return, that purportedly relates to a note (which is not in the record) issued by them to their Trust. Respondent disallowed all of the claimed interest deductions. OPINION The issue we must decide is whether the six petitioners before us on this issue may deduct certain payments made on promissory notes to their respective trusts as interest expense, under section 163. Petitioners bear the burden of proving that respondent's determination is in error. Welch v. Helvering, supra; Rule 142(a). A deduction is generally allowed on "all interest paid or accrued within the taxable year on indebtedness." Sec. 163(a). The term indebtedness means an unconditional and legally enforceable obligation for the payment of money. Linder v. Commissioner, 68 T.C. 792, 796 (1977). The determination of whether an obligation is legally enforceable requires an analysis of the law of the state in which the transaction occurred. Linder v. Commissioner, supra.The *242 state's highest court is the best authority on its own law, but if there is no decision by that court, then we must apply what we find to be the state's law after giving "proper regard" to relevant rulings of other courts of the state. See Commissioner v. Estate of Bosch, 387 U.S. 456, 465 (1967). If an obligation is not enforceable under pertinent state law, any interest paid on the obligation is not deductible. Linder v. Commissioner, supra.
The pertinent state's law in this case is the law of the State of California. Under California law, a gift of a donor's promissory note does not create an enforceable obligation since there is no consideration for the promise. Herbert v. Lankershim, 9 Cal.2d 409, 71 P.2d 220 (1937); In re McConnell's Estate, 6 Cal.2d 493, 58 P.2d 639 (1936); Coon v. Shry, 209 Cal. 612, 289 P. 815 (1930); Tracy v. Alvord, 118 Cal. 654, 50 P. 757 (1897); see Crosby v. Commissioner, T.C. Memo. 1977-350. The gift of a promissory note is merely a promise, without consideration, to give a sum of money in the future and is of no legal consequence. *243 Tracy v. Alvord, supra; Hironymous v. Hiatt, 52 Cal.App. 727, 199 P. 850, 853 (1921); see Crosby v. Commissioner, supra.
In the instant cases, on the same day that petitioners transferred cash to the Trusts (or shortly thereafter), Mr. DiRicco (as trustee) would return the cash back to petitioners in exchange for one-year promissory notes, bearing an interest rate of 20 percent. Petitioners deducted the "interest" paid to the Trusts when the notes matured. Petitioners essentially argue that their transfer of cash to the Trusts and the almost immediate loan of the same funds back to them by the Trusts should be viewed as two separate and distinct transactions. If viewed as such, since there was consideration given by the Trusts (cash) for the promissory notes of petitioners, the notes are enforceable and the interest is thus deductible. In contrast, respondent essentially argues that in substance the two transactions were mere steps in a single integrated transaction, relying upon Preston v. Commissioner, 44 B.T.A. 973 (1941), revd. 132 F.2d 763 (2d Cir. 1942), and Wilken v. Commissioner, T.C. Memo. 1987-272. *244 In Preston, on October 18, 1934, the taxpayer borrowed $ 125,000 from a bank and delivered that amount to a second bank, as trustee, to be held under a trust indenture for the benefit of a sister-in-law. The trustee was authorized under the trust indenture to lend that entire amount to the taxpayer on his bond. On the next day, October 19, 1934, the taxpayer delivered to the trustee his bond under seal, in which he covenanted to pay $ 125,000 in 20 years with interest *281 [EDITOR'S NOTE: The page numbers of this document may appear to be out of sequence; however, this pagination accurately reflects the pagination of the original published documents.] at four percent per annum. The trustee delivered $ 125,000 to the taxpayer, and the taxpayer used that amount to satisfy his loan from the first bank. On the above facts, the Board of Tax Appeals held that the only reasonable inference to be drawn from the various steps taken and the carefully drafted provisions of the trust indenture is that it was agreed between the taxpayer and the first bank that the $ 125,000 which he delivered to the trustee was to be returned to him almost immediately as a *245 "loan." The payment to the taxpayer of money which he himself supplied to the trustee for the very purpose cannot be a loan to him or furnish consideration for his bond. The practical effect of what was done was to set up a trust composed solely of the taxpayer's bond. 44 B.T.A. at 977. The Second Circuit in Preston on appeal (speaking through Judge Swan) agreed with the Board that the "loan" by the trustee cannot be deemed consideration for the taxpayer's covenant to pay the trustee $ 125,000 on a specified future date, and four percent annual interest before maturity. The Circuit Court went on to say that while there was no finding of an agreement by the trustee on receipt of the money to lend it immediately back to the taxpayer, that is the only reasonable inference to be drawn from the steps taken and the carefully drafted provisions of the trust indenture. The Circuit Court agreed that the surrounding facts created such an inference. Thus, the court held that "except for the seal," the settlor never lost control of the sum he turned over to the trustee. 132 F.2d at 765. (Emphasis added.) The Second Circuit reversed the Board, however, *246 because under the law of New York at the time the note was given, the seal affixed to the bond conclusively imported a consideration under New York law. [18]
More recently, we applied the reasoning in Preston to disallow a claimed interest deduction in Wilken v. Commissioner, supra. In Wilken, on August 7, 1978, one of two taxpayers assigned her interest in two $ 10,000 savings certificates to a trust. The next day, each of the taxpayers obtained an unsecured, one-day bank loan of $ 40,000. The $ 80,000 borrowed from the bank was contributed to trust corpus. On August 9, 1978, each taxpayer executed a $ 40,000 interest bearing promissory note in favor of the trustee, and paid off the bank loans. The taxpayers deducted the interest payments on their Federal *247 income tax returns. We held in Wilken that the net effect of the series of transactions surrounding the creation of the trust was that the taxpayers made transfers to the trusts of their own notes, which are unenforceable under state law either by the trustee or by the trust's beneficiaries and are no more than promises to make gifts in the future. As a consequence, the so-called interest payments were held nondeductible under section 163(a). Wilken v. Commissioner, supra.
We think that the operative facts in petitioners' cases are analogous to those present in Preston and Wilken. As in those cases, we believe that no reasonable inference can be drawn from the facts present other than that petitioners' transfers of cash to their Trusts and the loan back of the same amounts on the same day (or shortly thereafter) were in substance a single integrated transaction. Accordingly, we hold that the interest payments by petitioners are not deductible under section 163. Decisions will be entered for the respondent in docket Nos. 18488-86, 20476-86, and 21085-86. Decisions will be entered under Rule 155 in all remaining dockets. APPENDIX *248 Docket No.
Petitioner
Partnership +
Year
Deficiency
15015-86
Charles F. and Yvette
M. Alexander
CRI
1981
$ 15,840.00
1982
14,840.00
20946-86
John J. Antel,
Deceased, and Adelaide
C. Antel
BS, BSP
1982
8,997.00
20852-86
David W. and Kathy
Arana
Quoin
1982
1,848.00
20389-86
John T. and Mildred
E. Bennett
BS  1982
1,488.00
20497-86
Allen K. and Patti R.
Brooks
BSP
1982
1,429.00
21473-86
Donald R. Chiamparino
Matrix
1982
12,563.74
21101-86
Gary E. and Nancy
DeMartini
Quoin
1982
1,924.00
21099-86
Eddie S. and Janice
Fink
BS, BSP
1982
4,932.00
21084-86
Felix and Elinor Gatto
BS, BSP,
1982
56,048.50
Quoin
20388-86
Gerald J. Gleason, Jr.
BSP
1982
6,312.00
20457-86
Varney and Barbara
Glowner
BS, BSP
1982
1,892.00
20387-86
Imelda Hampton
BS
1982
1,430.64
21097-86
Robert M. and Alicia
P. Herman
BSP
1982
3,949.07
21102-86
Melvyn L. and Maureen
C. Hetzel
BS, BSP
1982
3,881.00
20476-86
Jo Ann Ison
BSP
1982
667.00
20205-86
Richard F. and Carol
Johnstone
BSP
1982
2,046.00
20498-86
Michael Knaak
BSP
1982
4,558.00
20341-86
William H. and Joan
Kirk
BS
1982
1,140.00
18488-86
Estate of Lester L.
Lewis, Deceased, Steve
Wechsler, Executor,
and Florence Lewis
BS
1982
1,881.00
20875-86
Abe S. and Sara Rae
Miller
BS, BSP
1980
861.00
1982
38,795.64
18367-86
George and Kathryn
Molakides
BSP
1982
7,376.00
20403-86
Giovanni P. and Ines
B. Oldini
Quoin
1982
3,894.00
20915-86
Martin F. and
Pattianne N. Parker
BS
1982
$ 969.00
20944-86
Albert and Agnes
Piccetti
Quoin
1982
4,875.00
20404-86
John and Nicole
Piccetti
Quoin
1982
2,212.52
20947-86
Roy L. and Barbara
Quilici
Quoin
1982
4,464.59
20478-86
Douglas N. and
Elizabeth R. Reid
BSP
1982
1,510.00
21434-86
Primo R. and Naomi J.
Repetto
Quoin
1982
4,874.50
21100-86
Salvadore J. and Linda
M. Rizzo
Quoin
1982
3,696.00
20405-86
Anthony J. and Barbara
Ann Scafine
Quoin
1982
3,836.00
21085-86
Harold and Dorothy
Siner
CRI
1980
24,011.06
20450-86
Patricia A. Steele
BS
1982
3,125.00
21382-86
David W. and Kathleen
Stell
Matrix
1982
2,888.00
20342-86
Gregg S. and Linda D.
Taylor
BS
1982
439.00
21018-86
Lance Thomson
BS, BSP
1982
3,776.00
20945-86
Vondina W. Thomson
BS, BSP
1982
2,127.00
20291-86
Terry L. and Laurie S.
Weitzman
BSP
1982
2,550.00
21483-86
Jim D. White
Matrix
1982
4,137.00
*249 *282 Additions Under Sections
Docket No.
Petitioner
6653(a)(1)++
6621(c)
6659
6661
15015-86
Charles F. and Yvette
M. Alexander
$ 792.00
742.00
$ 1,348.00
20946-86
John J. Antel,
Deceased, and Adelaide
C. Antel
450.00
20852-86
David W. and Kathy
Arana
93.00
20389-86
John T. and Mildred
E. Bennett
74.00
20497-86
Allen K. and Patti R.
Brooks
71.00
21473-86
Donald R. Chiamparino
628.19
*
$ 3,769.12
21101-86
Gary E. and Nancy
DeMartini
96.00
21099-86
Eddie S. and Janice
Fink
247.00
21084-86
Felix and Elinor Gatto
2,802.00
5,605.00
20388-86
Gerald J. Gleason, Jr.
315.60
631.20
20457-86
Varney and Barbara
Glowner
95.00
20387-86
Imelda Hampton
72.00
21097-86
Robert M. and Alicia
P. Herman
198.00
21102-86
Melvyn L. and Maureen
C. Hetzel
194.00
20476-86
Jo Ann Ison
20205-86
Richard F. and Carol
Johnstone
102.00
20498-86
Michael Knaak
228.00
20341-86
William H. and Joan
Kirk
57.00
18488-86
Estate of Lester L.
Lewis, Deceased, Steve
Wechsler, Executor,
and Florence Lewis
20875-86
Abe S. and Sara Rae
Miller
1,740.00
3,877.00
18367-86
George and Kathryn
Molakides
369.00
737.00
20403-86
Giovanni P. and Ines
B. Oldini
195.00
20915-86
Martin F. and
Pattianne N. Parker
$ 48.00
20944-86
Albert and Agnes
Piccetti
244.00
20404-86
John and Nicole
Piccetti
110.00
20947-86
Roy L. and Barbara
Quilici
223.00
20478-86
Douglas N. and
Elizabeth R. Reid
75.00
21434-86
Primo R. and Naomi J.
Repetto
244.00
21100-86
Salvadore J. and Linda
M. Rizzo
185.00
20405-86
Anthony J. and Barbara
Ann Scafine
192.00
21085-86
Harold and Dorothy
Siner
20450-86
Patricia A. Steele
156.00
21382-86
David W. and Kathleen
Stell
144.00
$ 866.40
20342-86
Gregg S. and Linda D.
Taylor
22.00
21018-86
Lance Thomson
189.00
20945-86
Vondina W. Thomson
106.00
20291-86
Terry L. and Laurie S.
Weitzman
128.00
21483-86
Jim D. White
207.00
*250 Footnotes
1. The cases consolidated herewith for trial, briefing, and opinion are set forth in the Appendix.↩
2. On July 27, 1989, Mr. DiRicco resigned from the Tax Court Bar, effective October 10, 1989. At the time the opinion in this case was filed, the taxpayers formerly represented by Mr. DiRicco were proceeding pro se.↩
3. The cases referred to are: Harold and Dorothy Siner, docket No. 21085-86; Gerald J. Gleason, Jr., docket No. 20388-86; and Robert M. and Alicia P. Herman, docket No. 21097-86.↩
4. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
5. This issue is present in the following cases: Donald R. Chiamparino, docket No. 21473-86; David W. and Kathleen Stell, docket No. 21382-86; and Jim D. White, docket No. 21483-86.↩
6. The six cases referred to and the years in issue (in parentheses) are: Charles F. and Yvette M. Alexander, docket No. 15015-86 (1981 and 1982); John J. Antel, deceased, and Adelaide C. Antel, docket No. 20946-86 (1982); Allen K. and Patti R. Brooks, docket No. 20497-86 (1982); Eddie S. and Janice Fink, docket No. 21099-86 (1982); Melvyn L. and Maureen C. Hetzel, docket No. 21102-86 (1982); and Terry L. and Laurie S. Weitzmen, docket No. 20291-86 (1982).↩
7. Section 174(a)(1) refers to deductions thereunder as "research or experimental expenditures," which are more commonly known as research and development expenses. We will use these two terms interchangeably when referring to deductions under section 174.↩
8. Similar motions were filed by respondent, and denied by the Court, in every case before us, except Charles F. and Yvette M. Alexander (docket No. 15015-86), Donald R. Chiamparino (docket No. 21473-86), Gerald J. Gleason, Jr. (docket No. 20388-86), Imelda Hampton (docket No. 20387-86), Harold and Dorothy Siner (docket No. 21085-86), David W. and Kathleen Stell (docket No. 21382-86), and Jim D. White (docket No. 21483-86).↩
9. This problem has generally been resolved by Congress (for partnership taxable years beginning after September 3, 1982) through section 6221 et seq. by issuing a single notice of final partnership administrative adjustment to a tax matters partner and by determining the tax treatment of any partnership item at the partnership level. Sec. 402(a), Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 648.↩
10. The following petitioners are before us regarding this issue: (1) the Siners, with respect to CRI; (2) Mr. Gleason, with respect to BSP; and (3) Donald R. Chiamparino (docket No. 21473-86), David W. and Kathleen Stell (docket No. 21382-86), and Jim D. White (docket No. 21483-86), with respect to Matrix.↩
11. (b) AMOUNTS CONSIDERED AT RISK. -- (1) IN GENERAL. -- For purposes of this section, a taxpayer shall be considered at risk for an activity with respect to amounts including -- (A) the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, and (B) amounts borrowed with respect to such activity (as determined under paragraph (2)). (2) BORROWED AMOUNTS. -- For purposes of this section, a taxpayer shall be considered to be at risk with respect to amounts borrowed for use in an activity to the extent that he -- (A) is personally liable for the repayment of such amounts, or (B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the fair market value of the taxpayer's interest in such property). No property shall be taken into account as security if such property is directly or indirectly financed by indebtedness which is secured by property described in paragraph (1). (3) CERTAIN BORROWED AMOUNTS EXCLUDED. -- For purposes of paragraph (1)(B), amounts borrowed shall not be considered to be at risk with respect to an activity if such amounts are borrowed from any person who -- (A) has an interest (other than an interest as a creditor) in such activity, or (B) has a relationship to the taxpayer specified within any one of the paragraphs of section 267(b). * * *↩
12. In his reply brief, respondent generally conceded that all of the promissory notes in question were bona fide. However, respondent also stated that "since petitioners failed to produce evidence regarding the $ 300,000 note given [by BS to MBS] in 1981, respondent submits that petitioners have failed to establish their entitlement either to an increase of basis or to an amount at risk * * *." While the $ 300,000 note itself is not in evidence, we are convinced (based upon testimony and other exhibits in evidence) that the note was in fact given by BS to MBS. We draw no negative inference against petitioners by their failure to produce the note, because the note's existence was not truly in dispute until brought up by respondent in his reply brief.↩
13. (b) Loans for which the borrower is personally liable for repayment -- (1) General rule. If a borrower is personally liable for the repayment of a loan for use in an activity, the lender shall be considered a person with an interest in the activity other than that of a creditor only if the lender has either a capital interest in the activity or an interest in the net profits of the activity. (2) Capital interest. For the purposes of this section a capital interest in the activity means an interest in the assets of the activity which is distributable to the owner of the capital interest upon the liquidation of the activity. The partners of a partnership * * * are considered to have capital interests in the activities conducted by the partnership * * *. (3) Interest in net profits↩. For the purposes of this section it is not necessary for a person to have any incidents of ownership in the activity in order to have an interest in the net profits of the activity. For example, an employee or independent contractor any part of whose compensation is determined with reference to the net profits of the activity will be considered to have an interest in the net profits of the activity.
14. Neither party has specifically raised a more narrow issue of whether the presence of the options would effect the determination of whether the limited partners were at risk at the close of the taxable year. This question has been posed by two commentators as follows: For example, suppose the lender is entitled to compensation equal to the greater of 6% of profits or $ 15,000. Prop. Reg. 1.465-8(b), Example (3) takes the position that a net profits interest exists since there is a possibility that the compensation could be determined by reference to profits. Query whether this rule would encompass a creditor who does not have a present net profits interest, but who may acquire one in the future (e.g.. [sic] by exercise of an option, or by a loan convertible into an equity interest)? Since the at-risk determination is made at the close of the taxable year (see Prop. Reg. 1.465-1(a)), it would seem that the creditor would not be deemed to have a proscribed interest. * * * [Howard & Rosenberg, "Working with the Proposed At-Risk Regs: Needed Clarification, Unresolved Problems," 51 J. Taxation 342, 345 (1979).] Due to the lack of argument and evidence on this narrow issue, we decline to address it.↩
15. As a point of information, however, we would note that BSP erroneously reported that its organizational expenditures were deductible under section 248(a)↩, which applies to the organizational expenditures of corporations. Section 709 applies to the treatment of organization and syndication fees by partnerships.
16. The lead case tried before the Court was Eddie S. and Janice Fink, docket No. 21099-86.↩
17. Prior to amendment by section 1402(a) of the Tax Reform Act of 1986 (TRA 86), Pub. L. 99-514, 100 Stat. 2085, 2711-2712, section 673(a) treated a trust grantor as the owner of any portion of a trust in which he had a reversionary interest in either the corpus or income if the interest would, or was reasonably expected, to take effect in possession or enjoyment within 10 years commencing with the date of the transfer of that portion of the trust. Accordingly (before TRA 86), the income from a trust with a reversionary interest in the grantor and a specified duration of 10 years or more would be taxable to the trust's beneficiary. This form of trust was commonly referred to as a "Clifford trust," drawing its name from the seminal case of Helvering v. Clifford, 309 U.S. 331↩ (1940).
18. In Linder v. Commissioner, 68 T.C. 792, 796 n. 4 (1977), we noted that -- In the intervening years, the holding in the Preston↩ case has been displaced by a modification of New York law. N.Y. Gen. Constr. Law Sec. 44a (McKinney Suppl. 1977). At the present time in New York, the seal, except as otherwise expressly provided by statute, is without legal effect. * * *
*. Additional interest to be determined. + In the case of certain joint petitioners, one spouse owned the partnership interest(s) in question. ++ Plus 50 percent of the interest due on the portion of the underpayment attributable to negligence, under section 6653(a)(2).↩